D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARA GOREL,

                                Plaintiff,

            -against-

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                                Defendant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CV-5660 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Mara Gorel brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial

review of the Social Security Administration's ("SSA") decision that she was not disabled and

therefore not entitled to disability insurance benefits ("DIB"). Gorel argues that the SSA made

two errors in denying her application for benefits: that it (1) failed to properly evaluate the

opinions of her treating physicians; and (2) failed to consider the demands of her past relevant

work in concluding that she was capable of performing that work. The Commissioner of Social

Security has filed a motion, and Gorel has filed a cross-motion, for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, the

Commissioner's motion is DENIED, Gorel's motion is GRANTED, and this case is

REMANDED to the SSA for further proceedings.

## I.      BACKGROUND

Gorel was born on September 21, 1969. (See Administrative Record (Docket Entry # 28)

("Rec.") at 304.) She is a college graduate, and has worked as a teacher's assistant, customer

service representative, clerical worker, and telephone solicitor. (Id. at 306-10.)

On August 23, 2002, Gorel applied for DIB, alleging a disability onset date of May 1, 2002. (Id. at 59, 67.) The SSA denied her claim, and Gorel requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 40-43.) On May 16, 2005, ALJ Hazel C. Strauss held a hearing regarding Gorel's claim at which Gorel testified, represented by counsel. (Id. at 333-407.) The ALJ held a supplemental hearing on June 29, 2005, at which medical advisor Ernest Abeles and a vocational expert testified. (Id. at 297-332.) On December 11, 2006, ALJ Strauss denied Gorel's claim. (Id. at 12-27.) Gorel requested review before the SSA Appeals Council; that request was denied on September 5, 2007. (Id. at 4-7.)

Gorel then filed a civil action in this court challenging the decision of the SSA. (Id. at 439.) By Stipulation and Order dated June 2, 2008, the case was remanded to the SSA for further administrative proceedings, pursuant to 42 U.S.C. § 405(g). See Stipulation and Order, Gorel v. Comm'r of Soc. Sec., No. 07-CV-4052 (NGG) (E.D.N.Y. June 2, 2008), Docket Entry # 16. On July 2, 2008, the SSA Appeals Council vacated ALJ Strauss's decision because "a consent agreement had been signed with Dr. Abeles restricting his practice of medicine," and thus "testimony should not have been received by Dr. Abeles." (Rec. at 443.) Accordingly, the SSA Appeals Council directed the ALJ to offer Gorel the opportunity for a new hearing. (Id.)

ALJ Strauss held a new hearing on February 12, 2009, at which Dr. John Axline testified as a medical expert. (Id. at 633-89.) On October 8, 2009, ALJ Strauss issued a decision denying Gorel's claim. (Id. at 416-33.) Gorel then sought review before the Appeals Council; this request was denied on October 30, 2010 (id. at 408), rendering the ALJ's decision the final decision of the Commissioner. See 42 U.S.C. § 405(g).

On December 7, 2010, Gorel filed the instant Complaint seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the SSA's decision that she was not disabled and therefore not

entitled to DIB. The Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def. Mot. (Docket Entry # 22); Def. Mem. (Docket Entry # 23).) Gorel filed a cross-motion for judgment on the pleadings, requesting that the court find her disabled and remand only for the calculation of benefits. (See Pl. Mot. (Docket Entry #24); Pl. Mem. (Docket Entry #25).)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). The standard for reviewing a Rule 12(c) motion is the same standard that is applied to a Rule 12(b)(6) motion to dismiss for failure to state a claim. Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). To survive either kind of motion, the complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).

### B. Review of Final Determinations of the Social Security Agency

"The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); see also Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not

supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Thus, as long as (1) the ALJ has applied the correct legal standard and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

### C. Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the [Social Security] Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Act. See 20 C.F.R. § 404.1520(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.

4

If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" . . . of the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (citations omitted).

The ultimate "burden is on the claimant to prove that he is disabled." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (alterations omitted). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner "to show there is other gainful work in the national economy that the claimant could perform." Id.

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate

facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id.

## III. DISCUSSION

Gorel argues that the ALJ erred in concluding that she was not disabled under the Social Security Act. (Pl. Mem. at 47.) She does not dispute the first three steps of the ALJ's five-step analysis: (1) that she had "not engaged in substantial gainful activity since May 1, 2002" (Rec. at 421); (2) that she "ha[d] medically determinable severe impairments," namely "arthritis, cellulitis and possible ostemyelitis of the left fifth digit and tendinopathy of the 4th and 5th fingers" (id.); and (3) that she did not have an impairment that met or exceeded the Listing of Impairments (id. at 428).

At step four, the ALJ found that despite Gorel's medically determinable severe impairments, she had the residual functional capacity for a "full range of light work"[1] because she could "sit, stand and/or walk without limitations," and could therefore engage in those activities "for up to 6 hours in an 8 hour day." (Id.) Based on this residual functional capacity, the ALJ found that Gorel was able to perform her past relevant work, classified in the Dictionary of Occupational Titles as teacher's aide, broker's assistant, customer service representative, and clerk. (Id. at 433.)

Gorel argues that the ALJ made two errors at step four of her analysis: that she (1) failed to properly evaluate the opinions of Gorel's treating physicians; and (2) failed to consider the

---

[1]     The Second Circuit has described "light work" as follows:

The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time. A person who is deemed able to perform light work is also capable of doing sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009).

specific demands of Gorel's past relevant work in concluding that Gorel was capable of performing that work.

## A.    Evaluation of Gorel's Treating Physicians

The ALJ found that the opinions of Gorel's treating physicians—Drs. Kenneth Kamler, Paul Lerner, Steven Carsons, and Vincent Leone—were entitled to "very little weight." (Id. at 432.) She based these findings in part on the opinions of Dr. Kyung Seo, a consulting physician who examined Gorel on October 23, 2002, and Dr. John Axline, a reviewing physician who never examined Gorel but testified by telephone at Gorel's hearing based on his review of the medical record. (See id. at 137, 432, 648-87.) Gorel argues that the ALJ failed to properly evaluate the opinions of her treating physicians. (Pl. Mem. at 40-41.) With respect to Dr. Kamler's opinion, the court disagrees; with respect to the opinions of Drs. Lerner, Carson, and Leone, the court agrees.

A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." [2] Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008) (internal quotation marks omitted). Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). On the other hand, "[w]hen other substantial

---

[2]    It is undisputed that Drs. Kamler, Lerner, Carsons, and Leone qualify as "treating physicians" under this definition.

7

evidence in the record"—such as other medical opinions—"conflicts with the treating physician's opinion, [ ] that opinion will not be deemed controlling." Snell, 177 F.3d at 133. And in any case, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner" and are therefore never given controlling weight. Id. (internal quotation marks omitted).

If an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must assess several factors to determine how much weight to give the assessment. See 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must assess "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically recite each of these factors, the ALJ must "appl[y] the substance of the treating physician rule." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

The court will address each of Gorel's treating physicians in turn.

1.    Dr. Kamler's Opinion

Gorel asserts that the ALJ improperly evaluated Dr. Kamler's opinion. (Pl. Mem. at 46.) She does not, however, provide any specific basis for this claim, and indeed there appears to be none, as the ALJ reasonably concluded that Dr. Kamler's opinion was inconsistent with the record. Dr. Kamler stated that Gorel may have experienced pain "due to scar tissue build up"

(Rec. at 240), but as the ALJ observed, "nowhere [wa]s scar tissue shown to exist" (id. at 431).

Dr. Kamler also diagnosed contracture of the left hand (id. at 239), but as Dr. Axline testified

and as the ALJ noted, "contracture means the hand is in a fixed position," a diagnosis that was

"discredited by a normal x-ray of [Gorel's] left hand" (id. at 431). Finally, as the ALJ explained,

Dr. Kamler's opinion that Gorel "could never lift or carry any number of pounds" was

inconsistent with (1) the lack of any demonstrated impairment in her right hand; and (2) Gorel's

own testimony "that she [could] lift and carry 8 to 10 pounds with the right hand." (Id.) The

ALJ thus provided "good reasons" for giving little weight to Dr. Kalmer's opinion. Halloran,

362 F.3d at 33; see also Snell, 177 F.3d at 133 ("[T]he less consistent [an] opinion is with the

record as a whole, the less weight it will be given."); Harper v. Comm'r of Soc. Sec., No.

08-CV-3803 (NGG), 2010 WL 5477758, at *6 (E.D.N.Y. Dec. 30, 2010) (multiple

inconsistencies between a treating physician's opinion and the record permitted the ALJ to

discount that opinion).

### 2. Dr. Leone's Opinion

Next, Gorel argues that the ALJ failed to properly evaluate Dr. Leone's opinion. The

court agrees that the ALJ failed to provide "good reasons" for discrediting Dr. Leone's opinion.

Halloran, 362 F.3d at 33.

In her decision, the ALJ stated that she accorded "very little weight" to Dr. Leone's

opinion because she found that his diagnoses of psoriatic arthritis, pelvic arthritis, and lumbar

herniated discs were "not supported by the record," and because his "opinion regarding the

claimant's residual functional capacity" was inconsistent with Gorel's daily activities. (Rec. at

431). The court will address each of these explanations in turn.

9

a. *Psoriatic Arthritis Diagnosis*

Contrary to Dr. Leone's diagnosis, the ALJ found that the record did not establish that Gorel suffered from psoriatic arthritis. She explained:

> Dr. Leone [ ] states "bloodwork-psoriatic arthritis," but [ ] there is no blood work that establishes psoriatic arthriti[s]. Actually the lab reports show "sero negative" rheumatoid arthritis, as reported by Dr. Lerner, which means the absence of psoriatic arthritis. Therefore, I find that the record does not establish psoriatic arthritis.

(Id. at 426.)

The ALJ's explanation suffers from three flaws: (1) it has no basis in the medical testimony; (2) she apparently accorded less weight, without any convincing explanation, to Dr. Leone's opinion than to Dr. Axline's opinion, even though Dr. Axline never examined Gorel and even though his opinion as to psoriatic arthritis was internally inconsistent; and (3) she failed to acknowledge the opinions of Drs. Seo and Carsons with respect to psoriatic arthritis, which supported Dr. Leone's opinion.

First, the record contains no medical evidence to support the ALJ's statement that "'sero negative' rheumatoid arthritis . . . means the absence of psoriatic arthritis." Defining "sero negative arthritis," Dr. Axline testified: "There is such a thing that [sic] where people have inflammatory arthritis, but they have no reactivity in the blood for rheumatoid factor. And those are called sero negative arthritis." (Id. at 655). This statement referred to whether Gorel had *inflammatory* arthritis; Dr. Axline did not explain what bearing his statement may have had, if any, on whether Gorel had psoriatic arthritis. Similarly, the ALJ referenced neurologist Dr. Lerner's notes in her conclusion that "the lab reports show 'sero negative' *rheumatoid* arthritis"

(id. at 426 (emphasis added)), but she established no connection between that diagnosis and psoriatic arthritis.[3]

Nor is it clear what the ALJ meant by her statement that "there is no blood work that establishes psoriatic arthriti[s]." (Id. at 426.) This could mean either (1) that psoriatic arthritis is a condition that cannot be established through blood tests, or (2) that the record contains no reports of blood tests that support Dr. Leone's diagnosis. Either of these findings would be flawed: the first because the record provides no basis for a conclusion that blood tests cannot establish psoriatic arthritis; and the second because a missing report would not contradict Dr. Leone's diagnosis but trigger a duty for the ALJ to seek additional information from him. See Schaal, 134 F.3d at 505 ("[I]f the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); Packer v. Apfel, No. 97-CV-3263 (FB), 1999 WL 14668, at *5 (E.D.N.Y. Jan. 11, 1999) ("The lack of specific clinical findings in the treating physician's report does not, by itself, justify the ALJ's failure to credit the physician's opinion." (citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998))).

Second, although many of the medical observations scattered throughout the ALJ's decision are attributed to no one, it appears that the ALJ's conclusion that Gorel did not suffer from psoriatic arthritis was based on the testimony of (if anyone) Dr. Axline. Assuming that is the case, the ALJ erred by adopting Dr. Axline's opinion on psoriatic arthritis over Dr. Leone's

---

[3]     In a different report, Dr. Lerner listed an impression of "[a]rthritis thought to [be] sero negative psoriatic arthritis," noting that Gorel was "scheduled to follow-up with her rheumatologist." (Rec. at 271.) But his notes made clear that these impressions were based on the diagnosis of another physician, and that he recommended that Gorel follow up with her rheumatologist regarding her arthritis condition. (Id. at 271-73.) A neurologist's passing reference to another doctor's diagnosis of an arthritic condition does not provide a basis for discrediting the diagnoses of multiple treating physicians. Cf. Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) ("Medical reports that are not based on personal observation 'deserve little weight in the overall evaluation of disability.'" (quoting Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990))). In any event, the ALJ did not ground her conclusion as to psoriatic arthritis in Dr. Lerner's passing reference regarding psoriatic arthritis; she based her conclusion on Dr. Lerner's opinion as to *rheumatoid* arthritis (see Rec. at 426), which, as discussed above, was improper.

11

without any meaningful explanation for why she was doing so. (See Rec. at 427.) "The general rule is that the [opinions] of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990) (internal quotation marks omitted); see also Filocomo v. Chater, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) ("[C]onclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight."); 20 C.F.R. § 404.1527(d)(1). Here, in addition to having never examined Gorel, Dr. Axline provided inconsistent testimony regarding psoriatic arthritis. At certain points in his testimony, Dr. Axline suggested that the record supported neither psoriatic nor inflammatory arthritis. (See Rec. at 683 (stating that "to call it psoriatic without psoriasis is unusual," that it was "not possible," and that "inflammatory without evidence of inflammation is strange"); id. at 661 ("[W]hen we look at all the criteria for identifying inflammatory arthritis, she does not meet the criteria.").) Elsewhere, however, Dr. Axline acknowledged that swollen fingers or "sausage digits" are "a characteristic of psoriatic arthritis." (Id. at 655.) He added that the "only positive finding" that Gorel had swollen digits was in July 2004 (id. at 655-56), but in fact, the record included many other references to Gorel's swollen finger, several of which the ALJ mentioned elsewhere in her decision (see id. at 422 ("The documentary medical evidence includes an x-ray of the left hand on October 4, 2002[,] that reveals soft tissue swelling over the fifth digit . . . . On August 29, 2002[,] claimant's symptoms were improving and she had less pain and less stiffness. Her left 5th finger was still swollen. . . . Examination [on October 3, 2002,] revealed a decreased range of motion in the left wrist and swelling of the left fifth finger . . . ."); id. at 422-23 ("Notes from Winthrop University Hospital on July 29, 2002 indicate that claimant complained of symptoms in her left fifth digit . . . . Her fifth left digit was swollen and she had tendinopathy in the left fourth and fifth fingers")).

12

Adding to the confusion, Dr. Axline acknowledged that "the treatments that [Gorel] has been given are recognized treatments for severe inflammatory psoriatic arthritis." (Id. at 669.) He then appeared to express a lack of understanding of the issue: "My question is, we don't have psoriasis. We don't have evidence of inflammation. So it's a matter of judgment. I'm not a rheumatologist." (Id.) In light of the uncertainty and inconsistency with which Dr. Axline expressed his opinion on psoriatic arthritis, this is not a case calling for an exception to the general rule that opinions of physicians who never examined the claimant deserve little weight, particularly relative to those of a treating physician.

Finally, the ALJ erred by failing to acknowledge the opinions of Drs. Seo and Carsons with respect to psoriatic arthritis, which supported Dr. Leone's diagnosis. The ALJ found that Dr. Seo's opinion was entitled to "significant weight" because it was "not inconsistent with the record as a whole and [wa]s not inconsistent with the opinion of Dr. Axline." (Id. at 432.) At least part of that statement, however, is clearly false; whereas Dr. Seo diagnosed Gorel with "psoriatic arthritis involving fourth and fifth finger [of her] left hand, mainly fifth finger" (id. at 138), Dr. Axline, as discussed above, found that the record did not support a psoriatic arthritis diagnosis. The ALJ did not attempt to resolve this discrepancy, nor did she acknowledge Dr. Seo's psoriatic arthritis diagnosis despite the "significant weight" she purported to accord his opinion. (Id. at 432.) The ALJ also failed to acknowledge Dr. Carson's diagnosis of psoriatic arthritis. (See id. at 155, 157.) Although the ALJ ultimately accorded "very little weight" overall to Dr. Carson's opinion for other reasons (id. at 432), she should have considered his psoriatic arthritis diagnosis in particular before rejecting Dr. Leone's opinion on that impairment. See Halloran, 362 F.3d at 32 (ALJ must consider "evidence in support of the treating physician's opinion" in determining how much weight to give the opinion).

13

In sum, by failing to provide a sound explanation for her refusal to credit Dr. Leone's psoriatic arthritis diagnosis, by failing to address substantial evidence supporting that diagnosis—including the opinions of two physicians who examined Gorel—and by instead adopting the tentative and inconsistent opinion of a non-treating physician, the ALJ erred.

b. *Pelvic Arthritis Diagnosis*

The next reason the ALJ provided for according "very little weight" to Dr. Leone's opinion was that his diagnosis of pelvic arthritis was "not supported by the record." (Rec. at 431.) The only explanation the ALJ offered for this statement appears five pages earlier in her decision, where she wrote that "[p]elvic arthritis is also not documented as because [sic] the x-rays of the sacrum and coccyx were negative." (Id. at 426). The ALJ credited no source for this finding. Dr. Leone did note that x-rays of the sacrum and coccyx were "negative *for fractures and dislocations*," but did not suggest that those x-rays bore any relationship to his pelvic arthritis diagnosis. (Rec. at 287 (emphasis added).) Indeed, nothing in the medical testimony suggests that it was even possible to diagnose pelvic arthritis using x-rays of the sacrum and coccyx; Dr. Axline did not address Dr. Leone's finding of pelvic arthritis, and the only tests he mentioned for arthritis were blood sedimentation rates (id. at 658), reactivity in the blood for rheumatoid factor (id. at 655), and evidence of swelling (id.).

Because no medical testimony supported the ALJ's finding, she erred in pointing to Dr. Leone's pelvic arthritis diagnosis as a reason for according very little weight to his opinion.

c. *Lumbar Herniated Disc Diagnosis*

Another reason the ALJ provided for discrediting Dr. Leone's opinion was that his diagnosis of lumbar herniated discs was "not supported by the record." (Rec. at 431). Again, the

14

ALJ cited no medical testimony in support of this conclusion, and review of the record seems to confirm, rather than contradict, the diagnosis.

During Gorel's hearing, the ALJ questioned Dr. Axline about Dr. Leone's herniated disc diagnosis:

> [ALJ]: Now [Dr. Leone] talks about an MRI of the cervical spine showing central disc bulges, and an MRI of the lumbar spine showing a herniation. Are there those?
>
> [Dr. Axline]: Yeah. There are some MRI's in the file, but we have no—the significance of bulges of a disc have to do with compromise of neurologic function. In her case neurologic function is not compromised on the basis of these MRI findings in the spine.

(Id. at 672.)

Dr. Axline's testimony about the significance of the bulges does not contradict Dr. Leone's diagnosis of lumbar herniated discs. If anything, Dr. Axline seemed to suggest that the MRIs *did* support the conditions that Dr. Leone diagnosed, although he may have disagreed as to the *implications* of those conditions. Thus, his testimony provided no basis for—and may indeed contradict—the ALJ's conclusion that Dr. Leone's diagnosis of lumbar herniated discs was "not supported by the record." Cf. Rustico v. Astrue, No. 05-CV-349 (SLT), 2008 WL 2622926, at *9 (E.D.N.Y. July 1, 2008) (where there was no "clear contradiction" between consulting and treating physicians' opinions, their disagreement as to the severity of the claimant's limitations 'f[ell] far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion'" (quoting Shaw, 221 F.3d at 134)).

d.  *Physical Capacity Limitations*

Finally, the ALJ stated that she accorded "very little weight" to Dr. Leone's opinion because his "opinion regarding the claimant's residual functional capacity" was inconsistent with Gorel's daily activities. (Rec. at 431). The ALJ wrote:

> With respect to Dr. Leone's opinion regarding the claimant's residual functional capacity (Exhibit 12F [Rec. at 274-80]), if the sitting, standing/walking limitations were correct, the claimant would be bed-bound, which of course she is not, while engaged in her activities of living, including driving several times a day, caring for her three children, including a young infant and toddler[,] caring for herself and attending physical therapy.

(Id.) The exhibit referenced by the ALJ was a form completed by Dr. Leone. (See id. at 247-80.) The relevant portion began with the instruction, "[p]lease answer each of the following questions by estimating the degree of [the claimant's] ability." (Id. at 276.) In response to questions included in the form, Dr. Leone estimated that Gorel could sit "< 1 hr." during an entire 8-hour work day, and "stand/walk" for a total of "< 30 min." during the same period. (Id.) Elsewhere, the form asked whether the patient had any limitations for driving a motor vehicle; Dr. Leone checked the box marked "none." (Id. at 278.)

Although the ALJ's characterization of Dr. Leone's opinion as describing a "bed-bound" claimant seems exaggerated, she was free to consider Gorel's daily activities in determining whether his opinion was inconsistent with substantial evidence in the record and therefore not entitled to controlling weight. See Snell, 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion, [ ] that opinion will not be deemed controlling."); Dowdy v. Barnhart, 213 F. Supp. 2d 236, 245 (E.D.N.Y. 2002) ("[P]roceeding through the five-step analysis, the Commissioner must consider the complete record, including any objective medical evidence, as well as the claimant's subjective statements concerning her or his impairments, restrictions, daily activities and any other relevant statements."); but see

Carbone v. Astrue, No. 08-CV-2376 (NGG), 2010 WL 3398960, at \*17 (E.D.N.Y. Aug. 26, 2010) (holding that a claimant's activities, absent evidence that a claimant engaged in those activities "'for sustained periods comparable to those required to hold a sedentary job,'" did not "by themselves qualify as substantial evidence in support of the ALJ's decision" not to accord controlling weight to a treating physician's opinion (quoting Carroll v. Sec'y of Health & Human Services, 705 F.2d 638, 643 (2d Cir. 1983))). The court assumes that the ALJ did not err in giving less than controlling weight to Dr. Leone's testimony based on its inconsistency with Gorel's daily activities.

However, the ALJ did err by failing to properly determine *how much* weight to accord his opinion. As discussed above, when not according controlling weight to a treating physician's opinion, an ALJ is required to address "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503-04. The ALJ based her decision on the third factor—consistency—but she did not properly apply the second factor. As discussed above, she ignored important evidence in support of Dr. Leone's opinion, such as other physicians' concurring diagnoses of psoriatic arthritis, and mischaracterized other evidence, such as the medical testimony regarding pelvic arthritis and lumbar herniated discs. Remand is therefore appropriate because the ALJ failed to properly "consider all of the factors cited in the regulations." Id. at 504; see also Halloran, 362 F.3d at 32.

Moreover, "[t]he regulations are clear that a treating physician's opinion should not be completely rejected if that opinion is found to be non-controlling." Ellington v. Astrue, 641 F. Supp. 2d 322, 330 (S.D.N.Y. 2009). Although the ALJ stated that she accorded "very little

17

weight" to Dr. Leone's opinion, she appears to have accorded it none at all. The ALJ explicitly
rejected—for unconvincing reasons—each of the findings of Dr. Leone that she discussed, and,
so far as the court can tell, incorporated no part of Dr. Leone's opinion into her analysis of
Gorel's residual functional capacity. Even assuming that Dr. Leone's estimates of Gorel's
residual functional capacity were inconsistent with Gorel's description of her daily activities—a
conclusion for which the ALJ provided no coherent explanation—the ALJ's decision to
completely disregard his opinion on the basis of that single inconsistency was unjustified,
particularly as the limitations Dr. Leone noted were explicitly only "estimat[es]." (Rec. at 276.)
See also Ellington, 641 F. Supp. 2d at 330; cf. Hach v. Astrue, No. 07-CV-2517 (ENV), 2010
WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010) (holding that an ALJ properly accorded less than
controlling weight to a treating physician's assessments of a claimant's physical limitations in
check-off forms because those assessments were contradicted by the claimant's testimony and
other medical opinions, but that the rest of the treating physician's opinion could not be
completely disregarded without properly examining the factors set forth in 20 C.F.R.
§ 404.1527).

In sum, because the ALJ failed provide good reasons for rejecting Dr. Leone's opinion
and thus failed to apply the substance of the treating physician rule, remand is appropriate for
reconsideration of that opinion. See Halloran, 362 F.3d at 32-33.

### 3.   Dr. Carson's Opinion

Gorel argues next that the ALJ improperly evaluated Dr. Carson's opinion. (Pl. Mem. at
41-42.) The court agrees.

The ALJ explained that she give "very little weight" to Dr. Carson's opinion because
(1) he noted an impairment of Gorel's right foot, which the ALJ found unsupported by the

18

record; (2) he diagnosed "sero negative spondylarthropathy" but "sero negative means an absence of diagnostic evidence"; and (3) the physical capacity limitations he indicated—including Gorel's inability to lift any amount of weight, limitations for sitting, standing, and walking, and her incapability of "repetitive use of right hand and both feet[] or reaching with right upper extremity"—were "not supported by diagnostic tests or substantial evidence in the record, including claimant's testimony." (Rec. at 432.) The first explanation fails because it relies on an apparent mischaracterization of Dr. Carson's finding. The second fails because it has no basis in the evidence. The third explanation was an adequate basis for the ALJ's decision not to accord controlling weight to Dr. Carson's opinion, but requires remand because the ALJ again failed to properly determine how much weight to give his opinion.

a. *Right Foot Impairment*

With respect to Gorel's right foot, Dr. Carson's opinion contains a section marked "patient's signs (clinical findings)," where he wrote, "sausage digit, 2nd right foot." (Id. at 233.) Referring to this finding, the ALJ stated:

> With regard to Dr. Carson's opinion (Exhibit 10 F pages 4-9 [Rec. 232-237]), he mentions involvement of a 2nd digit of the right foot, but the record does not establish a medically determinable impairment of the right foot. There was a one time note of right big toe swollen. Also, Dr. Axline testified there [was] no functional impairment because of the note regarding the toe. There is no diagnostic evidence of a right foot impairment.

(Id. at 432.) Although the ALJ did not cite a particular portion of Dr. Axline's testimony in this explanation, Dr. Axline's analysis of Gorel's right foot appears to be limited to a statement that "[a] sore toe is a common thing, and that would not produce the functional limits stringent [sic] and have no functional significance as long as you're wearing shoes." (Id. at 666.)

There is simply no contradiction between Dr. Axline's testimony and Dr. Carson's opinion regarding Gorel's right foot; each merely acknowledges a swollen toe. (See id. at 655

(explaining that "sausage digit" describes inflammation or swelling).) Contrary to the ALJ's suggestion, Dr. Carson's opinion did not state that the swollen toe created any "medically determinable impairment" or "functional impairment" (id. at 432), nor did the "diagnosis" section of his opinion include any diagnosis related to Gorel's foot (id. at 233). Thus, the ALJ mischaracterized Dr. Carson's finding, and erred in according less weight to his opinion based on this mischaracterization. Cf. Rustico, 2008 WL 2622926 at *9.

b.  *Spondyloarthropathy Diagnosis*

Next, the ALJ discredited Dr. Carson's diagnosis of sero negative spondyloarthropathy, writing: "[Dr. Carson] also diagnoses sero negative spondyloarthropathy . . . . As stated above, sero negative means an absence of diagnostic evidence." (Rec. at 432.) Once again, the ALJ cited no medical authority in support of her statement that "sero negative means an absence of diagnostic evidence." And although the record contains nearly two pages of testimony from Dr. Axline regarding the spondyloarthropathy diagnosis, nothing in that testimony supports the ALJ's statement. (Id. at 651-53). Dr. Axline testified that "spondyloarthropathy to meet or equal a listing [in the SSA's Listing of Impairments] requires some x-ray changes in the spine or sacroiliac joints that are characteristic," and that there was no x-ray in the record supporting such a finding. (Id. at 653). But whether Gorel's condition met the Listing of Impairments says little about whether Dr. Carson's diagnosis was correct, because Dr. Carson did not suggest that Gorel's condition met any listing; he stated only that Gorel suffered from spondyloarthropathy. Thus, so far as the court can tell from the record, Dr. Carson's spondyloarthropathy diagnosis was not a good reason for discounting his opinion.

20

c. *Physical Capacity Limitations*

Describing her third basis for according "very little weight" to Dr. Carson's opinion, the ALJ wrote:

> Dr. Carson[] also checks off limitations inconsistent with the evidence [in the] record, i.e. sitting, standing[, and] walking limitation[s] of 30 minutes in an 8-hour day. In addition, [sic] such limitations would make claimant bed bound, which, as shown above, she certainly is not. Further, limitations for lifting no amount of pounds; and for no repetitive use of right hand and both feet; or for reaching with right upper extremity are not supported by diagnostic tests or substantial evidence in the record, including claimant's testimony.
>
> Dr. Carson's physical capacity evaluation form [(Rec. at 230)] with limitations for no standing or walking and less than 2 hours sitting in an 8-hour day and lifting and carrying no more than 2 pounds cannot be attributed to claimant's documented severe impairment in her left hand digits. There is no other objective documentation to support the limitations.

(Id. at 432.)

As with her analysis of Dr. Leone's opinion (see Part III.A.2.d, supra), the ALJ did not err in according less than controlling weight to Dr. Carson's opinion because it was inconsistent with Gorel's own testimony about her daily activities. But the ALJ erred by rejecting his opinion wholesale on that basis. See Ellington, 641 F. Supp. 2d at 330; cf. Hach, 2010 WL 1169926, at *11. Moreover, as discussed above, Dr. Carson diagnosed psoriatic arthritis (see id. at 155, 157), and the ALJ ignored that diagnosis entirely in her evaluation of Dr. Carson's opinion. Dr. Leone's and Dr. Seo's concurring diagnoses of this condition are "evidence in support of" Dr. Carson's opinion and should have been considered under the second Schaal factor. 134 F.3d at 503-04. Because the ALJ failed to properly apply the treating physician rule with respect to Dr. Carson's opinion, remand is required for reconsideration of that opinion.

### 4. Dr. Lerner's Opinion

Finally, Gorel argues that the ALJ failed to properly evaluate Dr. Lerner's opinion. She is correct.

Although the ALJ credited Dr. Lerner's diagnosis of mild carpal tunnel syndrome (see Rec. at 431), the ALJ gave "very little weight" to his opinion regarding Gorel's limitations on sitting, standing, walking and her need to change position (id. at 432). The ALJ wrote:

> Dr. Lerner's physical capacity evaluation [(Rec. at 231)] insofar as the limitations for sitting, standing, walking and need to change position, they [sic] are not supported by the record, as claimant does not have an objectively documented lumbar impairment or impairment of her lower extremities to which such limitations could be attributed.

(Id.) The "physical capacity evaluation" to which the ALJ referred was another preprinted form. (See id. at 231.) In the form, Dr. Lerner checked boxes indicating that, in an eight hour work day, Gorel could "[s]tand and/or walk . . . . up to 2 hours per day," and that she could sit for "[l]ess than 6 hours per day." (Id.) He also wrote that Gorel "[m]ust be allowed to change position[, and] cannot continuously stand or walk or sit." (Id.)

Earlier in her decision, the ALJ conducted an additional analysis regarding Gorel's purported lumbar impairment:

> Although an MRI report is referred to by Dr. Lerner, he mentioned only a bulge. Therefore, even if the lumbar impairment is established by that reference, examination findings are rare, if at all pertaining to the lumbar spine and there are no neurological deficits shown and no basis for functional limitations due to lumbar impairment.

(Id. at 430-31.) The ALJ's decision does not make this clear, but her conclusion regarding Gorel's lumbar impairment appears to have been based on the opinion of Dr. Axline, who testified that the MRIs Dr. Lerner had used in his diagnosis showed a "bulging disc" and "cervical bulges" and noted that bulging was "common." (Id. at 673.) Dr. Axline did testify that

the MRIs did not support Dr. Lerner's diagnosis of cervical radiculopathy (id.), but he did not suggest that Gorel suffered from no lumbar impairment, nor did he opine on what limitations, if any, could result from a bulging disc and cervical bulges. Explaining why she did not find a medically determinable severe lumbar impairment, the ALJ wrote: "Dr. Axline testified that although there are bulges, neurologic functions are not compromised. Further, he said the MRI findings in the cervical spine shown on December 7, 2006 are only millimeters, with no change since August 2004 and a millimeter is smaller than 1/16 of an inch." (Id. at 425-26.)

The problem with the ALJ's analysis is that neurological impairments do not appear to be the basis for the limitations Dr. Lerner found for sitting, standing, and the need to change position. Nor did the ALJ or Dr. Axline attempt to explain why a small bulge, measured in millimeters, would not result in the relatively unrestrictive limitations Dr. Lerner noted. In any event, even assuming a legitimate conflict between Dr. Lerner's and Dr. Axline's opinions, the ALJ once again failed to explain why she chose to credit the non-examining physician over the treating physician, as she was required to do. See Vargas, 898 F.2d at 295. The ALJ therefore did not provide "good reasons" for assigning little weight to Dr. Lerner's opinion, and remand is required for reevaluation of his opinion.

### B.    Gorel's Ability to Perform Her Prior Work

Finally, Gorel argues that the ALJ erred by failing to consider the demands of Gorel's previous jobs in concluding that she could return to her past relevant work. (Pl. Mem. at 49.) As discussed above, the ALJ's determination of Gorel's residual functional capacity was premised upon an improper evaluation of three treating physician opinions, which would naturally have influenced her conclusion that Gorel could return to her past work. On remand, the ALJ is directed to consider the demands of Gorel's past work in light of a fresh evaluation of the

23

treating physicians' opinions. Cf. Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) (because the ALJ's failure to properly apply the treating physician rule "affect[ed] consideration of the ALJ's treatment of the plaintiff's subjective complaints," the court would "not now consider" plaintiff's argument that the ALJ did not properly consider her complaints).

## C. Disposition

As discussed above, the court concludes that this matter must be remanded to the SSA. The court may either remand for further proceedings or remand for the limited purpose of calculating benefits. See Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). Remand for calculation of benefits is appropriate where application of the correct legal standards "could lead to only one conclusion." Id. But where there are gaps in the administrative record or where further findings would be helpful to assure proper disposition of the claim, the court must remand for further proceedings. See Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999); Pokorny v. Astrue, No. 09-CV-1694 (NGG) (JO), 2010 WL 5173593, at *5 (E.D.N.Y. Dec. 14, 2010); Pogozelski, 2004 WL 1146059, at *20.

Gorel asks the court to remand her case solely for calculation of benefits because she has "introduced substantial, indeed compelling, evidence of disability." (Pl. Mem. at 47.) But despite the ALJ's failure to properly apply the treating physician rule, the court does not find that there is unequivocal evidence of disability, or that further findings would be unhelpful to assure proper disposition of Gorel's claim. Although the medical testimony in the record was insufficient to do so, further testimony may show that some of the diagnoses made by Gorel's treating physicians were inaccurate, which may weigh against a finding of disability. For example, further medical testimony may establish that Gorel's MRIs did not show lumbar herniation; or that she did not suffer from spondyloarthropathy; or that test results disproved her

24

diagnosis of psoriatic arthritis; or that her lumbar bulges were too small to result in any functional impairment. Thus, a remand for further proceedings is proper.

## V.    CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is DENIED, Gorel's motion for judgment on the pleadings is GRANTED, and this case is REMANDED to the SSA for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      August 3, 2012

NICHOLAS G. GARAUFIS
United States District Judge